UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
LORRAINE CREDLE,                                  :
                                                  :
                        Plaintiff,                :
                                                  :         **OPINION AND ORDER**
            -against-                             :         10-CV-5624 (DLI)
                                                  :
MICHAEL J. ASTRUE,                                :
Commissioner of Social Security,                  :
                                                  :
                        Defendant.                :
------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

Plaintiff Lorraine Credle filed an application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act (the "Act") on May 16, 2006, alleging disability caused by a workplace injury on October 21, 2005. (R. 203-07.) A hearing was held on July 19, 2007 before Administrative Law Judge Jay Cohen ("ALJ Cohen"). On December 7, 2012, ALJ Cohen determined that plaintiff was not disabled within the meaning of the Act. (R. 129.) On March 26, 2009, the Appeals Council ("AC") remanded to further develop and assess the mental impairment. (R. 130-134.) On January 7, 2010, Administrative Law Judge Hazel Strauss ("ALJ Strauss") conducted a second hearing. On May 13, 2010, ALJ Strauss determined that plaintiff was not disabled within the meaning of the Act. (R. 1-83, 114.) This became the Commissioner's final decision on October 8, 2010, when the Appeals Council denied plaintiff's request for review. (R. 84.)

On December 6, 2010, plaintiff commenced the instant action seeking review and reversal of the Commissioner's decision, pursuant to 42 U.S.C. § 405(g). The Commissioner now moves for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c), to affirm the denial of benefits. (Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings ("Def. Mem.") at 1.)

For the reasons set forth below, the Commissioner's motion is denied, and the case is remanded to give proper weight to plaintiff's testimony, medical evidence not limited to the right hand, and examinations and assessments made by plaintiff's treating physicians.

## BACKGROUND

Plaintiff was born on January 29, 1955 and worked as a dental assistant at Jamaica Hospital since 1994. On October 21, 2005, plaintiff suffered a workplace injury, when a cabinet fell on her as she was assisting a doctor with a patient. (R. 5, 12.) Hospital records indicate an injury to her right hand and bruises to her neck and left shoulder, but the diagnosis was limited to an avulsion of her right middle finger. (R. 304, 309.) Plaintiff is right-handed. (R. 6.) In early 2006, plaintiff attempted to resume work, but her supervisor would not hire her for any position, "not even answering a telephone." (R. 35.) She has not worked since. (R. 7-8.)

## I.    Medical Evidence

### A.    Medical Evidence on Plaintiff's Physical Condition

On October 21, 2005, after plaintiff's workplace accident, she was treated at the Emergency Room of Jamaica Hospital. (R. 304-16.) Plaintiff suffered an injured right hand with x-rays indicating a possible avulsion of the third finger. (R. 304, 309-10.) Records from Jamaica Hospital also indicate bruises or redness to the forehead, neck, and left shoulder, and tests were ordered as to the left shoulder. (R. 304, 307, 310.)

#### 1.    *Dr. Gary S. Bromley and Physical Therapy Sessions in 2006*

From October 26, 2005 to November 9, 2005, hand surgeon Dr. Gary S. Bromley conducted plaintiff's initial treatments for her workplace injury to her right hand. The right hand had mild swelling and decreased range of motion ("ROM"), but swelling had lessened by November 9. (R. 408-09.) On January 18, 2006 and April 12, 2006, Dr. Bromley prescribed a right hand splint and physical therapy sessions three times a week for eight weeks. (*Id.*) He

filled out disability certificates on November 9, 2005, December 14, 2005, and April 12, 2006. (R. 318.)  On September 20, 2006, Dr. Bromley stated that "claimant should not return to the profession of Dental Assisting."  (R. 339.)

Plaintiff attended five physical therapy sessions at Jamaica Hospital from December 24, 2005 to January 30, 2006 and cancelled twice.  (R. 314-15.)  She was discharged because of cancellations and lateness.  (*Id*.)  Plaintiff resumed physical therapy on March 27, 2006 at Theradynamics Physical Therapy.  (R. 410.)  The session report indicated "mild swelling" and "tenderness" to her right middle finger, "fair grip strength," "constant pain," and diminished ROM.  (*Id*.)  Between her sessions at Jamaica Hospital and Theradynamics, plaintiff saw osteopath Dr. A. Shusterman on February 13, 2006 and March 21, 2006.  (R. 340, 411-13.)  He diagnosed a right middle finger fracture and right wrist sprain, found her gait unimpaired, Tinel's sign negative bilaterally, and no abnormalities to the head, neck, or spine.  (R. 412-13.)  An MRI on her right wrist on March 8, 2006 was normal.  (R. 340.)

2.    *Consultative Examination By Dr. Steven Calvino*

On July 18, 2006, plaintiff had a consultative examination with orthopedist Dr. Steven Calvino at the request of the Social Security Administration ("SSA").  (R. 319-22.)  Dr. Calvino noted complaints of continued pain and numbness of the right middle finger, and that plaintiff took ibuprofen and wore a splint.  (R. 319-20.)  Plaintiff had an inability to cook, clean, do laundry, or shop by herself, but she was able to shower and dress herself independently.  (R. 320.)  Dr. Calvino found hand and finger dexterity intact, and grip strength to be full in the left hand (5/5), but limited in the right hand (4/5) due to pain.  (*Id*.)  Appearance, spine, and extremities were normal, with no significant restrictions.  (R. 320-21.)  He diagnosed "right hand pain," a fractured right middle finger, and gave a "good" prognosis.  (R. 321.)  Dr. Calvino assessed a mild limitation in the right upper extremity for repetitive gripping, heavy lifting and

carrying, but no restrictions to the left upper extremity, and no restriction for standing, walking, sitting, or fine motor activities of the bilateral upper extremities. (R. 322.)

        *3.*      *Hand Surgeon – Dr. Ignatius Roger*

Plaintiff began treatment with hand surgeon Dr. Ignatius Roger on September 12, 2006. (R. 335.) She considered him her primary physician, as she visited him more consistently than any other doctor between 2006 and 2010. (R. 15, 422-26.) Dr. Roger initially noted the right hand had moderate diffuse edema, a tremor, decreased wrist motion and finger flexion, and felt cooler than the left hand. (R. 423.) Tinel, Compression and Phalen's tests of the right hand were positive. (R. 422.) He diagnosed right hand and wrist contusion, fractured right middle finger, neuroplaxia of the dorsal radial sensory nerve, right CTS, and possible right hand reflex sympathetic dystrophy ("RSD") and prescribed Lyrica, Licoderm patches, and physical therapy. (R. 423.)

Plaintiff next saw Dr. Roger on January 30, 2007 and told him that she had not received therapy for her hand since August 2006. (*Id.*) Dr. Roger prescribed Neurontin, because Lyrica had caused drowsiness and weight gain. (*Id.*) On February 27, 2007, Dr. Roger advised a home exercise program and use of a Transcutaneous Electrical Nerve Stimulation ("TENS") unit; he also referred her for psychological evaluation and vocational counseling. (*Id.*)

At her March 27, 2007 visit, plaintiff reported the pain had worsened in her right upper extremity and was radiating to her neck, with a "cold sweaty feeling" at the dorsal and volar aspects of the right forearm and hand. (*Id.*) There was moderate edema of the right hand and middle finger, and reduced flexion. (*Id.*) He re-examined the plaintiff on May 16, 2007 and there was positive right hand Tinel's, carpal compression, and Phalen's signs, diffuse tenderness in her right hand, wrist, and forearm, and decreased ROM of the right wrist, with pain in all

extremes.  (*Id.*)  On June 13, 2007, plaintiff complained of significant pain associated with therapy.  There was hypoesthesia at the dorsum of the right hand and the right index, middle, and ring fingers as well as pain and decreased sensation in the right median distribution.  (R. 424.) Plaintiff had decreased ROM in the wrist, and had developed a right hand tremor at rest.  (*Id.*) She was referred to occupational therapy and pain management.  (*Id.*)

On July 17, 2007, plaintiff told Dr. Roger that she had gone to the Emergency Room at Franklin Hospital after a fall on July 10 when her left leg went numb and gave out.  (*Id.*) Plaintiff complained of pain to bilateral upper extremities, back and neck.  (*Id.*)  On July 18, 2007, he completed a "Physician's Report for Claim of Disability Due to Physical Impairment" ("2007 Physician's Report").  (R. 355-60.)  In it, he reported plaintiff's symptoms as pain and "sweaty feeling" in her right upper extremity, and clinical findings as tenderness and decreased ROM.  (*Id.*)  Lab results were a positive bilateral carpel tunnel syndrome EMG and a negative MRI.  A bone scan was not taken due to contraindication, and plaintiff's medical conditions could be expected to last at least twelve months.  (*Id.*)  The medication, Neurontin, caused plaintiff drowsiness.  (*Id.*)  Plaintiff could "occasionally" lift and carry five pounds, but could not use her right hand for simple grasping, pushing and pulling of arm controls, and fine manipulation.  (R. 359.)  Dr. Roger noted a mild driving limitation, but did not know whether plaintiff could travel alone daily via public transit.  (*Id.*)  Dr. Rogers wrote "N/E" regarding plaintiff's restrictions for the following: sit, stand, walk, bend, squat, crawl, climb, reach, use feet for repetitive movements, activities with environmental limitations, dietary restrictions and whether the plaintiff had to lie down during the day.  (R. 356-59.)

On August 3, 2007, plaintiff complained to Dr. Roger of pain in all her digits bilaterally, with the right hand worse than the left, and in both wrists.  (R. 424, 438.)  Dermal coloration and

temperature were equal in both upper extremities; there was a mild tremor of the right hand and an inability to flex completely any digit of the right hand to the palm, but no edema. (*Id.*) He continued the past treatment regimen of Neurontin and pain management. (*Id.*)

On November 6, 2007, Dr. Roger observed paresthesias in both hands, decreased finger flexion in both hands, and decreased pinch strength bilaterally. (R. 424, 439.) Carpal Tinel and Phalen's tests were positive bilaterally. (*Id.*) He again noted symmetrical dermal coloration in the upper extremities with diffuse edema, and hands and wrists were tender bilaterally. (*Id.*) Dr. Rogers indicated that plaintiff had RSD symptoms, and recommended continued rehab and psychiatric treatment. (*Id.*) On December 18, 2007, Dr. Roger detected tremors in both hands, diffuse paresthesias of both upper extremities and neck, and noted complaints of neck and bilateral shoulder pain. (R. 424-25, 440.) An EMG was positive for cervical spine involvement. (*Id.*) He prescribed splints to both hands and recommended she visit a spine specialist. (R. 440.)

Plaintiff next saw Dr. Roger on February 19, 2008, and told him that she had been unable to go to pain management, because psychiatric medications prevented her from traveling. (R. 425, 441.) She continued to complain of pain in both upper extremities. (*Id.*) Dr. Roger observed high sensitivity to touch in the right middle finger, with mild diffuse edema and sweating in both hands. (*Id.*) He recommended a pain management specialist and prescribed Lidoderm patches. (*Id.*) On May 14, 2008, plaintiff complained of "burning" in both hands, with right worse than the left. (R. 425, 442.) Dermal color and temperature were symmetrically equal in both hands, with increased sweating of the right hand. (*Id.*) Dr. Roger noted that surgical intervention would be contraindicated due to plaintiff's RSD. (*Id.*) Plaintiff saw Dr. Roger again five months later on October 8, 2008 – his notes concerned only the right hand. (R. 425.)

Plaintiff visited Dr. Roger a year later, on October 20, 2009. (R. 425, 443.) She reported

that she had not secured pain management care, but was taking Neurontin, Lexapro, Seroquel, and Motrin, and using a TENS unit at home.  (R. 426.)  Plaintiff was able to approximate the tips of the right index, ring, and fifth digits to the proximal palm, and had a three-centimeter deficit on composite flexion of the right middle digit.  (R. 425.)  She had mild edema in the right upper extremity, with derma slightly darker in the right than left.  (R. 425-26.)

On November 23, 2009, Dr. Roger drafted a letter for a lawsuit plaintiff filed against the installer of the cabinet that had injured her at work in 2005.  (R. 22, 422-26.)  Dr. Roger summarized his treatment over the last three years and diagnosed multiple contusions, subsequent development of RSD, neuropraxia of the right radial nerve, flexor tenosynovitis, and CTS.  (R. 426.)  He gave a "poor" prognosis and wrote that, "[d]ue to the clinical manifestations of these diagnoses, the patient must rely upon the assistance of her family for routine activities of daily living and is totally disabled."  (*Id*.)

Dr. Roger next saw plaintiff on January 4, 2010.  (R. 430.)  Plaintiff complained of inability to hold objects with her right hand, decreased sensation to all digits, and bottles "sliding through" right hand.  (*Id.*)  Dr. Rogers observed that plaintiff had edema of both hands, as well as ecchymotic bruises along her right forearm.  (*Id*.)  Dr. Roger completed a 2010 Residual Function Capacity ("RFC") Questionnaire ("2010 questionnaire") regarding plaintiff's shoulders, arms, and hands, and indicated problems with: fine and gross manipulations in both hands with lifting, objects falling, and carrying less than a pound; using fingers for ADLs such as cutting food, dressing, opening windows, drinking from containers, opening soda cans or turning bottle caps; stretching, pushing, pulling, and reaching with both arms.  (R. 445-46.)

4.  *Dr. Carlisle St. Martin, the Electromyogram, and Dr. Dante A. Cubangbang*

Plaintiff visited neurologist Dr. Carlisle St. Martin on May 1, 2007, and complained of

severe right hand pain, pulsating pain and swelling of her hands. (R. 337.) A motor exam indicated decreased ROM of the right hand and right upper extremity due to pain, and an inability to flex or extend the right hand due to pain. (*Id*.) Dr. St. Martin found no abnormalities from examining her head, eyes, ears, cranial nerves, and gait. (*Id*.) A sensory exam indicated decreased sensation in the right hand, primarily to the third finger. (*Id*.) An EMG of the upper extremities revealed bilateral CTS. (R. 338.)

On August 18 and October 3, 2007, plaintiff saw physiatrist Dr. Dante Cubangbang per Dr. Roger's physical therapy referral. (R. 373-76.) Plaintiff complained of headaches, bilateral shoulder and hand pain, neck pain radiating to the upper extremities, and lower back pain radiating to the lower extremities, numbness, tingling, and weakness to both upper extremities (right worse than the left) and her hands and legs. (R. 373.)

The doctor conducted an array of tests to the bilateral upper extremities, back, and neck. (R. 374-75.) For the spine, plaintiff tested positive for the Gaenslen test, positive bilaterally for the Spurling test, and straight leg raising elicited pain and paresthesia down the left lower extremity. (R. 374.) Shoulders and muscle strength testing was decreased but limited by pain. (R. 375.) Plaintiff was unable to maintain the arm in abduction with minimal force applied on the drop art test and was unable to resist a downward force on the empty can test, indicating possible supraspinatus tendon tear. (*Id.*) Plaintiff tested positive for the impingement sign and painful arc tests, but negative for the lift-off sign and Yergason's/Speed's tests. (R. 375.) Dr. Cubangbang observed increased spasms, limited ROMs, and tenderness to plaintiff's back, neck, and bilateral shoulders, as well as positive Tinel's, Phalen's, Compression, and Finkelstein tests for the hands and wrists. (R. 374-75.) Plaintiff exhibited normal ROMs in the lower extremities, "except for bilateral hip which is slightly limited by pain." (R. 375.) Neurological examination

showed no abnormalities to cerebrum, cranial nerves, cerebellum, and gait, but plaintiff did have decreased pinprick and light touch sensation in the antero-and postero-lateral aspect of arms down to the first 3.5 digits and in the bilateral L3-L5 dermatomal distribution, left worse than right, in the legs. (*Id.*)

Dr. Cubangbang's diagnosis indicated the following possible ailments: cervicalgia, cervical radiculopathy, bilateral shoulder adhesive capsulitis, tendinitis, myofascial pain syndrome, RSD, moderate right sensorimotor median neuropathy in the wrist, mild left sensory median neuropathy in the wrist, lumbar sprain/strain, bilateral sacroiliac joint dysfunction, and left trochanteric bursitis; and ruled out the following ailments: rotator cuff tear, herniated disc, and lumbar radiculopathy. (R. 376.) He advised physical therapy, pain medication and muscle relaxants, steroid injection to joints and to carpal tunnel, trigger point and epidural injections. He suggested an EMG/NCS of the lower and upper extremities, especially if her CTS got worse. (*Id.*) Dr. Cubangbang gave a guarded prognosis and indicated a total disability status. (*Id.*)

### 5. *Consultative Examination By Dr. Stanley Mathew*

At the request of the SSA, plaintiff saw orthopedist Dr. Stanley Mathew on July 18, 2009 for a consultative examination. (R. 103, 387-90.) Dr. Mathew observed a normal gait and no assistive devices. (R. 388.) He reported that plaintiff had difficulty squatting and walking on heels and toes, but needed no help changing for the exam or getting off the exam table, and that she could rise from a chair without difficulty. (*Id.*) Dr. Mathew noted impaired right hand and finger dexterity, difficulty zipping, tying, and buttoning on the right, and a right hand grip strength of 3/5. (*Id.*) There was decreased ROM in the bilateral shoulder, cervical and lumbar spine, though to a lesser extent than Dr. Cubangbang found, with pain to all planes. (R. 388-89.) Plaintiff had tenderness in the cervical spine, but had no spasms or trigger-points, and was negative bilaterally on the straight-leg raising test. (*Id.*) Plaintiff had full ROM of her elbows,

fingers, forearms, wrists. She had pain in her right wrists and fingers, and mild erythema and swelling of the right hand, but no muscle atrophy. (*Id*.) Plaintiff's reflexes in the upper extremities were intact, though she had decreased sensation throughout the right upper extremity. (*Id*.) Plaintiff had full ROM of her bilateral lower extremities, with strength at 4/5. (*Id*.) Dr. Mathew diagnosed possible chronic Complex Regional Pain Syndrome ("CRPS") of the right upper extremity, as well as "chronic bilateral neck and shoulder pain, possible rotator cuff injury versus cervical radiculopathy, chronic low back pain, myofascial pain, and possible lumbar radiculopathy." (*Id*.) He opined that plaintiff was moderately limited for walking, standing, climbing, lifting, and squatting, and severely limited in her right upper extremity for fine motor activities, lifting, carrying, reaching, and overhead activities. (R. 389-90.)

On July 19, 2009, Dr. Mathew completed the SSA's form regarding plaintiff's ability to do work-related activities. (R. 392-98.) According to his assessment, plaintiff was occasionally limited in her ability to lift and carry up to ten pounds because of weakness of the right upper extremity with severe numbness and tingling. (R. 392.) Plaintiff could sit and stand for two hours without interruption, and walk for three hours without interruption. (R. 393.) In an eight-hour workday, she could sit for four hours, and stand and walk for two hours. (*Id*.) Plaintiff occasionally could reach, handle, finger, feel, and push/pull with the right hand; and frequently could reach, and continuously handle, finger, feel, push/pull with the left hand. (R. 394.) Plaintiff was right-handed with symptoms of CRPS in the right upper extremity and had no real restraints for feet operations. (*Id*.) Plaintiff could occasionally operate a motor vehicle and occasionally work with environmental limitations, but never should be exposed to unprotected heights. For postural activities, plaintiff could occasionally climb stairs and ramps, balance, stoop, and kneel, but never could climb ladders or scaffolds, crouch, or crawl. (R. 395.) She had

low back pain radiating down right lower extremity that was aggravated by bending. (*Id.*) His basis for these conclusions were findings of "tenderness to L-S, cervical spine, limited ROM of B/L shoulders, tenderness to right upper extremity, [and decreased] grip strength." (R. 396.) Dr. Mathew opined plaintiff could shop, travel without a companion, ambulate without crutches, canes, or wheelchair, walk a block at a reasonable pace, use public transportation, prepare a simple meal, care for her personal hygiene, and sort, handle, and use paper files. (R. 397.) However, he provided no basis for these findings of ADLs. (*Id.*)

**B.     Medical Evidence Concerning Alleged Mental Impairment**

*1.     Psychologist – Dr. Denise Granda-Gilbert*

On referral from Dr. Roger, plaintiff began treatment with psychologist Dr. Denise Granda-Gilbert on February 7, 2007, and met with her weekly until August 8, 2007. (R. 450-56.) Dr. Granda-Gilbert noted that plaintiff presented in "a tearful, anxious" and "visibly depressed" state, as the plaintiff's life had been "altered immeasurably," both physically and psychologically, by the 2005 workplace injury. Plaintiff's anxiety level had caused her speech to be scattered and her loss of productivity and competence with respect to employment caused her to be severely depressed. (R. 450, 456.) On February 12, 2007, Dr. Granda-Gilbert indicated that plaintiff had become extremely depressed, anxious and suicidal, though plaintiff said her family depended on her too much to do anything about it. (R. 450.) On February 20, 2007, Dr. Granda-Gilbert noted plaintiff was depressed by the loss of her usual level of productivity, both at home and work. (*Id.*)

On February 26, 2007, plaintiff expressed that she had remained in a great deal of pain, but had recently married a supportive husband. (*Id.*) Dr. Granda-Gilbert then wrote a narrative report incorrectly dated "February 29, 2007," stating plaintiff engaged in a once-weekly,

individual psychotherapy regimen, utilizing a cognitive-behavioral mode, including, but not limited to, progressive relaxation, general mental imagery and clinical hypnosis. (R. 450-51.) Plaintiff was making slow, but steady progress, and would continue the regimen with the hope of being restored to her former psychological level. (R. 451.) Dr. Granda-Gilbert diagnosed the plaintiff with "Adjustment Reaction" (DSM IV 309.28) and a Global Assessment Functioning ("GAF") score of 52 (out of 100), with a guarded prognosis. (*Id.*)

At the weekly sessions with Dr. Granda-Gilbert, from March to July of 2007, plaintiff engaged in relaxation exercises, recalled early childhood experiences and her love life, and, though some improvement was detected, plaintiff also suffered setbacks, her thoughts and speech were "scattered", and was "reduced to tears when she [came] back to the present and her current state of disability." (R. 452-56.) On July 9, 2007, Dr. Granda-Gilbert questioned the sincerity of even the slightest improvement in the patient's demeanor, suggesting that it might be done to "please her psychologist." (R. 453.) On July 16, 2007, Dr. Granda-Gilbert encouraged plaintiff to see a psychiatrist to obtain proper medication for depression. (R. 452.)

On July 17, 2007, Dr. Granda-Gilbert completed a "Medical Assessment of Ability to Do Work-Related Activities." (R. 352-54.) As in February, Dr. Granda-Gilbert diagnosed plaintiff with adjustment reaction with mixed emotional features. (R. 352.) The doctor indicated plaintiff had poor to no ability to follow work rules, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently, and maintain attention and concentration. Plaintiff had a fair ability to relate to co-workers, and fair to poor/no ability to use judgment and interact with supervisors. (R. 353.) The bases for these conclusions were Dr. Granda-Gilbert's findings that plaintiff's depression/anxiety totally diminished her capacity to concentrate and interact with staff or the public effectively, and these symptoms were a major

characteristic of depression. (*Id*.) Plaintiff had poor to no ability to understand, remember, and carry out complex or detailed job instructions; and a fair to poor/no ability to understand, remember, and carry out simple job instructions. (*Id*.) The bases for these conclusions were Dr. Granda-Gilbert's findings that some of the major characteristics of depression are the disturbances of intellectual functions, and the ability to concentrate gets disintegrated completely because of a high-level of anxiety and, thus, comprehension, memory, and thought organization do not have a chance to occur systematically. (R. 354.) Plaintiff had a fair ability to maintain her personal appearance, a fair to poor ability to relate predictably in social situations, a poor ability to behave in an emotionally stable manner and to demonstrate reliability. (*Id*.) To support these ratings, Dr. Granda-Gilbert wrote that, in plaintiff's case, it was especially true that depression cripples the patient emotionally and psychologically. (*Id*.) When asked to give any other work-related activities affected, she wrote: "The explanations above suffice to explain all patient's limitations, psychologically, physically, and socially." (*Id*.)

Throughout her treatment of the plaintiff, Dr. Granda-Gilbert completed several New York Work Compensation forms. (R. 414-21.) On each form, the doctor wrote: "Patient presented in an extremely depressed, tearful, anxious state, with scattered speech due to the anxiety. She reports insomnia, anhedonia (absence of pleasure), loss of concentration and attention, feelings of worthlessness, helplessness and hopelessness and some suicidal ideation." (*Id*.) Dr. Granda-Gilbert also included patient's condition and progress: "Condition guarded due to her depression and anxiety. She is also mourning the loss of her productivity and her general inability to be competent at all, even at home (Pt. is right-handed)." (*Id*.) Plaintiff discontinued treatment with Dr. Granda-Gilbert on August 20, 2007 to begin psychiatric treatment. (R. 452.)

2.      *Psychiatrist – Dr. Vilor Shpitalnik*

On September 3, 2007, plaintiff began treatment with psychiatrist Dr. Vilor Shpitalnik, for complaints of depressed mood, anxiety, insomnia, lack of energy, nightmares, sadness, negative attitude, headaches, and inability to concentrate.  (R. 367-68.)  In his Comprehensive Psychiatric Evaluation ("CPE"), Dr. Shpitalnik reported that plaintiff presented with sad facial expression and slow psychomotor behavior, exhibited physical discomfort as the interview progressed, and, while her speech was coherent, articulate and goal-directed, it was at a low volume and rate.  He reported her affect was labile, she easily broke down in crying spells, and her mood was depressed, anxious, and tense.   There was no evidence of psychosis, hallucinations, or delusions.  Plaintiff denied any suicidal or homicidal ideations.  (R. 368.)  Cognitive functioning was normal, but with short-term memory and attention deficit.  (*Id*.)  He diagnosed major depressive disorder and a GAF score of 50, and prescribed Lexapro, Seroquel, and psychotherapy treatment every 1-2 weeks.  (R. 367-68.)

On November 21, 2007, Dr. Shpitalnik wrote a "progress note" that said plaintiff complained of being very tired and in pain all the time.  (R. 383.)  He indicated complaints of a depressed mood, anxiety, insomnia, lack of energy, and poor attention and concentration.  (*Id*.)  His reported plaintiff had a poor appearance and was tense and apprehensive.  (*Id*.)  Her mood was sad, anxious, and irritable, and her affect was constricted.  (*Id*.)  Her thoughts were coherent with no noted delusions, hallucinations, or suicidal ideations.  (*Id*.)  Cognition was fully oriented, but slowed, her short-term memory was impaired, concentration was reduced, and insight and judgment were fair.  (*Id*.)  Dr. Shpitalnik indicated that medication compliance was good, and increased the dosage.  (*Id*.)

Plaintiff next saw Dr. Shpitalnik on December 19, 2007.  (R. 365-66, 381.)  An "Updated

Psychiatric Evaluation" ("December Evaluation") noted that plaintiff's condition had not much changed. (R. 365.) The "Mental Status Examination" was a duplicate of his prior CPE, though he added, "[C]ognitive function is significant for short-term and attention/concentration deficit." (R. 366.) A progress note showed changes only to appearance, which had improved from "poor" to "fair." (R. 381, 383.) He added Wellbutrin to her treatment. (R. 366.)

Plaintiff last saw Dr. Shpitalnik on March 5, 2008. (R. 379.) The progress note reported complaints of depressed mood, anxiety, insomnia, and persistent pain. (*Id*.) The "Mental Status Examination" presented two changes since December: cognition and short-term memory were each marked "intact" instead of "slowed" and "impaired," respectively. (R. 379, 381.)

### 3. Consultative Examination By Dr. Arlene Broska

At the request of the SSA, psychologist Dr. Arlene Broska conducted a consultative examination of the plaintiff on October 2, 2009. (R. 399-403.) Plaintiff reported insomnia, feeling down every day, uncontrollable crying for no reason, and feeling disconnected, isolated, and lonely. (R. 400.) Though plaintiff reported no homicidal or suicidal ideation, she told Dr. Broska that she thought of cutting her own arm off, but that "religious beliefs preclude her from committing suicide." (*Id*.) Dr. Broska also noted a hyper startle response. (*Id*.) Plaintiff vaguely described auditory and visual hallucinations and reported constant pain, sweating, breathing problems, feeling angry all the time, problems with memory and concentration, and feeling cold even in the summer. (*Id*.) In her "Mental Status Examination," Dr. Broska said that plaintiff was cooperative and responsive, with adequate social skills, presentation, and language abilities. (R. 400-01.) Plaintiff's speech was fluent and clear, and thought processes were coherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the evaluation setting. (R. 401.) Affect was anxious, her mood neutral, and she was fully oriented.

(*Id*.) Attention, concentration, and memory skills were intact, cognitive functioning was average, and insight and judgment were fair. (*Id*.) Dr. Broska's medical source reported plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, and maintain attention and concentration. It appeared she should be able to learn new tasks and maintain a regular schedule unless contraindicated for medical reasons. She could perform some complex tasks independently, although plaintiff reported difficulties with many types of tasks due to her physical problems. She could make appropriate decisions, relate adequately with others, but did not always appropriately deal with stress. The results of the examination appeared to be consistent with psychiatric problems, but did not appear to be significant enough to interfere with plaintiff's ability to function on a daily basis.

(R. 401-02.) Dr. Broska diagnosed non-specified depressive disorder, but gave no GAF score. (R. 402.) Prognosis was, "[f]air with involvement in treatment." (*Id*.)

Dr. Broska completed an SSA Medical Source Statement of Ability to Do Work-Related Activities (Mental), indicating that plaintiff could make simple work-related decisions with no restriction in her ability to understand, remember or carry out simple instructions. (R. 404.) For complex work-related decisions, plaintiff had mild restrictions for complex instructions and judgments. (*Id.*) Dr. Broska noted plaintiff's memory was intact, but her mood symptoms and pain may interfere or impact her ability to perform more complex tasks. (*Id*.) The doctor noted mild limitations in plaintiff's ability to interact with the public, supervisors, and co-workers, and to respond to usual work situations and changes in a routine work-setting. (R. 405.) Plaintiff had adequate social skills, but her mood symptoms may impact interactions with others. (*Id*.) Dr. Broska found no other capabilities affected by the impairment. (*Id*.)

## II.    Non-medical and Testimonial Evidence

### A.    Plaintiff's Testimony at First ALJ Hearing on July 19, 2007

On July 19, 2007, ALJ Cohen conducted a disability hearing ("2007 ALJ hearing").  (R. 457-93.)  Plaintiff was represented at the hearing by attorney Topeka Chowdhry.  (R. 459.)  Plaintiff testified about the injuries to her head, back, shoulders, and upper extremities.  (R. 465.)  She testified that hand pain made her unable to hold anything in either hand and she often dropped things.  (R. 473.)  Plaintiff also testified that she experienced pain in her back, neck, shoulders, and legs, and, because it was difficult to sit down for more than five minutes at a time, she would lay down most of the time.  (R. 465-67.)  Plaintiff testified to the July 11, 2007 fall resulting in lacerations to both hands and a left foot nail avulsion, for which she had surgery to remove and clean the nail.  (R. 348-50, 469-70.)  She wore braces on each arm due to an electromyogram ("EMG") revealing bilateral carpal tunnel syndrome ("CTS").  (R. 471-72.)  Plaintiff testified she had been prescribed a cane, but it was too difficult to support her bodyweight to use it.  (R. 480.)  Finally, plaintiff testified she had been seeing a psychologist weekly for the past five months, and reported symptoms of depression, random crying spells, difficulty concentrating, and sleeping irregularities.  (R. 474, 80-81.)

Regarding her activities of daily living ("ADLs"), plaintiff testified she had difficulty bathing and washing, needed help dressing, particularly with zippers, buttons, tying things and making bows, and she no longer cooked, shopped, or cleaned the house.  (R. 475-78.)  She testified that she neither drove nor took public transportation, and, instead, her husband or mother drove her places such as church and Bible study.  (R. 475-77.)

### B.    Plaintiff's Testimony at Second ALJ Hearing on January 7, 2010

On remand from the AC, ALJ Strauss conducted a second disability hearing on January

7, 2010 ("2010 ALJ hearing").  (R. 1-83.)  Plaintiff was represented by attorney Carolyn Rose from the law firm of Richard T. Harris and Associates.  (R. 3.)  Plaintiff testified that the 2005 injury had caused her right hand to be numb and without any strength, and it would swell and throb such that she could not make a fist.  (R. 36, 39.)  She said problems with her left hand began in 2006.  (R. 14.)  She testified she complained to Dr. Gary Bromley about both hands, but acknowledged he addressed only her right hand since Workers' Compensation ("WC") had so limited her treatment.  (R. 14.)  Plaintiff testified to burning, hot and cold sensations in her hands, and of stabbing pain in her right arm that radiated to her neck and left side.  (R. 11.)  She claimed fine manipulations – such as picking, zipping, buttoning up, or pushing a button – caused great pain and made it very difficult to hold things.  (R. 11, 38-39.)  She also testified that her hands were "very weak," often had spasms, and were sore and swollen with discoloration and patches.  (R. 40.)

Plaintiff appeared with a cane, which she stated had been given to her at Franklin Hospital for back spasms on November 11, 2007.  (R. 42-43.)  She complained of pain and weakness in her left lower back and legs, difficulty standing and walking on stairs, and inability to walk a half block because of back pain.  (R. 12, 44.)  She could not cook, turn doorknobs or open bottles, and used disposable plates and cups due to gripping difficulties.  (R. 13.)  She testified she drove only twice a month to the local store.  (R. 7.)  She could stand for about 15 minutes without having to sit, and that she could sit forward in her seat for up to two hours without having to stand.  (R. 45.)

Plaintiff also testified that she suffered from severe depression, anxiety, suicidal thoughts, loneliness, sadness, isolation, crying, and feelings of guilt and disappointment for which she had seen a psychologist and a psychiatrist.  (R. 28-35.)  Plaintiff admitted to putting medicine bottles

in front of her and wondering what it would be like to be dead, but she never had taken pills to overdose or put a gun to her head.  (R. 83.)  Her psychiatrist prescribed her Seroquel and Lexapro, and told her not to drive or operate machinery.  (R. 34.)  Plaintiff testified she often felt confused and had difficulty remembering birthdays, names, and appointments.  (*Id.*)

C.      **Vocational Expert Testimony of January 7, 2010**

At the 2010 hearing, vocational expert ("VE") Patricia Sasona testified via phone.  (R. 46-82.)  ALJ Strauss posed four RFC hypotheticals.  (R. 48-50, 70-72, 76-77.)  The first was based on Dr. Calvino's assessment indicating a mild limitation for repetitive gripping activities and heavy lifting or carrying with the right upper extremity, and the VE testified one could work as a dental assistant.  (R. 48-50.)  The second was based on Dr. Roger's 2007 Physician's Report indicating ability to lift and carry occasionally up to five pounds, no limitations in bending, squatting crawling, climbing, reaching or in the lower extremities, mild limitations in driving, and no use of hand for repetitive grasping or fine manipulations.  (R. 50-52; *see* R. 358-59.)  Plaintiff's attorney objected to the ALJ's interpretation of "N/E" responses to mean "no limitations" as opposed to the doctor having no opinion.  (R. 50-52.)  The VE nevertheless testified that one could not work as a dental assistant, but would have transferable skills for a sedentary job like a receptionist or an information clerk.  (R. 52, 54-61.)  The restrictions would eliminate most light level jobs, except for except for gate guard, a sales attendant, and vending machine attendant.  (*Id.*)  The third hypothetical was based on Dr. Mathew's assessment indicating ability to lift and carry ten pounds occasionally with the right upper extremity, no limitation in the left upper extremity, and limitations as to sitting, standing and walking.  (R. 69-73.)  ALJ Strauss stated that Dr. Mathew had not provided a basis for his limitations as to the back and neck.  (R. 70.)  Plaintiff's attorney pointed out he had diagnosed chronic bilateral neck

and shoulder pain.  (*Id.*)  ALJ Strauss responded that his medical assessment of pain was not

"objective testing."  (R. 71.)  Plaintiff objected because Dr. Matthew's exam lasted "maybe five

minutes" and many of his responses had not resulted from observations or questioning.  (R. 73-

76.)  In response, the VE testified plaintiff could still work as a gate guard or information clerk.

(R. 75-76.)  The final hypothetical was based on Dr. Broska's finding of mental limitation that

required a low stress work environment and the VE testified one could still be a gate guard and

information clerk.  (R. 76-78.)

## DISCUSSION

I.    <u>Standard of Review</u>

Unsuccessful claimants for disability benefits under the Act may bring an action in

federal district court seeking judicial review of the Commissioner's denial of their benefits

"within sixty days after the mailing . . . of notice of such decision or within such further time as

the Commissioner of Social Security may allow."  42 U.S.C. §§ 405(g), 1383(c)(3).  Reviewing

the final determination of the Commissioner, the court must determine whether the correct

standards were applied and whether substantial evidence supports the decision.  *See Schaal v.*

*Apfel*, 134 F. 3d 496, 504 (2d Cir. 1998).  The former determination asks whether the plaintiff

has had a full hearing under the SSA regulations and in accordance with the purposes of the Act.

*Echevarria v. Sec'y of Health & Human Servs.*, 685 F. 2d 751, 755 (2d Cir. 1982).  The latter

determination asks whether the decision is supported by "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389,

401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record,

a judgment affirming, modifying, or reversing the decision of the Commissioner of Social

Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). A remand to the Commissioner is also appropriate where there are gaps in the administrative record. *Rosa v. Callahan*, 168 F. 3d 72, 83 (2d Cir. 1999) (citing *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F. 3d 770, 774 (2d Cir. 1999).

## II.    Disability Claims

To receive disability benefits, claimants must be "disabled" within the meaning of the Act. *See* 42 U.S.C. § 423(a), (d). Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof on disability status and is required to demonstrate disability status by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F. 2d 638, 642 (2d Cir. 1983).

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. § 404.1520. If at any step the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends there. First, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. §

404.1520(b). Second, the ALJ considers whether the claimant has a "severe impairment," without reference to age, education or work experience. Impairments are "severe" when they significantly limit a claimant's physical or mental "ability to conduct basic work activities." 20 C.F.R. § 404.1520(c). Third, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 ("Appendix 1"). *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's "residual functional capacity" ("RFC") in steps four and five. 20 C.F.R. § 404.1520(e). In the fourth step, the claimant is not disabled if he or she is able to perform "past relevant work." 20 C.F.R. § 404.1520(e). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education, and work experience. If so, the claimant is not disabled. 20 C.F.R. § 404.1520(f). At this fifth step, the burden shifts to the Commissioner to demonstrate that the claimant could perform other work. *See Draegert v. Barnhart*, 311 F. 3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F. 2d at 642).

## III.  The ALJ Decisions

### A.  ALJ Cohen's December 7, 2007 Decision

On December 7, 2007, ALJ Cohen issued his decision denying plaintiff's claim. The ALJ analyzed plaintiff's testimony from the July 19, 2007 hearing and medical records, including assessments and examinations from Drs. Bromley, Roger, Shusterman, Dr. Calvino, Granda-Gilbert, and Saint Martin. (R. 120-29.) ALJ Cohen questioned the plaintiff's credibility, and noted that "[c]onsiderable weight" was given to treating physicians, with greater weight given to examining physicians versus non-examining sources. (R. 127.) ALJ Cohen found

severe impairments consisting of right hand injury and adjustment disorder, but found the residential functional capacity to perform sedentary work, except for ability to grasp or perform fine manipulations of right hand. He found plaintiff to not be disabled under the Act. (R. 122-23.)

On March 26, 2009, the Appeals Counsel remanded ALJ Cohen's determination so that further evidence could be obtained, assessed, and developed regarding plaintiff's mental impairment using the special technique described in 20 C.F.R. §§ 1520a and 416.920a. (R. 130-134.)

**B.      ALJ Strauss's Decision on May 13, 2010**

On May 13, 2010, ALJ Strauss issued her decision denying plaintiff's claim. (R. 94-114.) In doing so, she followed the five-step procedure set forth in 20 C.F.R. §§ 404.1520 and 416.920 and found that the objective medical evidence demonstrated a severe impairment only in the right hand. (R. 96-114.) ALJ Strauss gave greater weight to the consultative doctors instead of plaintiff's treating sources, since she believed the consultative exams provided "more detailed findings." (R. 109.)

At the first step, ALJ Strauss found that plaintiff had not engaged in substantial gainful activity since her workplace accident on October 21, 2005. (R. 96.) At the second step, ALJ Strauss found that plaintiff suffered from only one severe impairment, complex regional pain syndrome ("CRPS") of the right hand. (*Id.*) She did not find any left upper extremity, back, neck or mental impairments, because there were no objective diagnostic tests to give clinical correlation to these impairments. (*Id.*) ALJ Strauss concluded that carpel tunnel syndrome ("CTS") was not a severe impairment, despite an EMG indicating bilateral CTS, because plaintiff was not being treated for CTS. (R. 96-97.) ALJ Strauss departed from the findings of

ALJ Cohen by not finding the severe mental impairment of adjustment disorder. (R. 122.)

At the third step, ALJ Strauss determined that none of plaintiff's impairments, either alone or in combination, met any impairment listed in Appendix 1. (R. 97.) For physical impairments, ALJ Strauss found plaintiff's injuries did not involve one major peripheral joint in each upper extremity, and, thus, did not result in an inability to perform fine or gross movements, a limitation required by Section 1.02 of Appendix 1. (*Id.*) Similarly, ALJ Strauss found no mental impairment to meet the criteria of Listing 12.04 of Appendix 1, *i.e.,* a finding of an "Affective Disorder," because plaintiff's mental impairment did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation of extended duration, as required by Section 12.04B and Section 12.04C of Appendix 1. (*Id.*)

At the fourth step, ALJ Strauss found that plaintiff could perform a range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), but not work requiring lifting or carrying in excess of five pounds with the right upper extremity or repetitive grasping, pushing, pulling, fine manipulation or fingering with the right hand. (R. 98.) In making these conclusions, ALJ Strauss discussed assessments for physical impairments from Drs. Bromley, Roger, Calvino, Mathew, Cubangbang, St. Martin, and Shusterman, (R. 98-106), and assessments for mental impairments from Drs. Granda-Gilbert, Shpitalnik, and Broska. (R. 105-11.) For both sets of impairments, ALJ Strauss gave controlling weight to plaintiff's consultative sources rather than the treating sources in making the RFC determination. (R. 109.)

At the fifth step, ALJ Strauss found that plaintiff was not able to perform past relevant work as a dental assistant or a full range of light work. However, given plaintiff's age, education, and transferable skills she could do work at the light exertion level, such as retail sales attendant or gate guard, and, thus, plaintiff was not disabled. (R. 112-14.) Here, ALJ Strauss

cited the Medical-Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, app. 2, and VE testimony to find that plaintiff's RFC left her with skills transferable to other jobs, such as information clerk and receptionist, which existed in significant numbers in the national economy. (R. 113.) Finally, ALJ Strauss noted that, even if plaintiff required a low stress job, the jobs of gate guard, information clerk, and receptionist could still be performed. (*Id.*)

## IV.    **Application**

The Commissioner now moves for judgment on the pleadings, seeking affirmation of his denial of benefits on the grounds that ALJ Strauss applied the correct legal standards to determine that plaintiff was not disabled, since the factual findings are supported by substantial evidence. (Def. Mem. at 1.) Plaintiff opposed, contending the ALJ committed legal errors, did not base her findings upon substantial evidence, failed to consider plaintiff's 2010 testimony, failed to follow the AC's remand directives as to mental impairment, erred in applying the "treating physician rule," and failed to properly evaluate plaintiff's credibility. The court finds that ALJ Strauss committed reversible error in evaluating plaintiff's physical and mental impairments, and, therefore, the Commissioner's motion is denied and the case is remanded in order for the ALJ to give proper consideration to plaintiff's treating physicians, subjective testimony, and other medical evidence.

### A.    **ALJ Strauss's Analysis of the Physical Impairments**

To determine a claimant's RFC, the ALJ "must consider objective medical facts, diagnoses and medical opinions based on such facts, and subjective evidence of pain or disability testified to by the claimant or others." *Pluck v. Astrue*, No. 10-CV-02042, 2011 WL 917654, at *22 (E.D.N.Y. Mar. 9, 2011) (quoting *Ferraris v. Heckler,* 728 F. 2d 582, 585 (2d Cir. 1984)). ALJ Strauss's analysis of the physical impairments did not adequately consider plaintiff's 2010

testimony or evaluate the objective medical evidence, and improperly weighed the doctors' examinations. As such, remand is warranted for the reasons discussed more fully below.

### 1. ALJ Strauss Did Not Adequately Consider Plaintiff's 2010 Testimony

When evaluating disability eligibility, "the ALJ must consider objective medical evidence as well as any testimony concerning an applicant's impairment(s), restrictions, daily activities, efforts to work, or any other relevant considerations." *Batista v. Chater*, 972 F. Supp. 211, 218 (2d Cir. 1997) (citing 20 C.F.R. § 404.1512(b)(3)); *see also Mimms v. Heckler,* 750 F. 2d 180, 185 (2d Cir. 1984) (the Second Circuit "has long held that the subjective element of pain is an important factor to be considered in determining disability"). Nevertheless, while the court does not accept "an unreasoned rejection of all the medical evidence in a claimant's favor," the fact finder need not explicitly go over every piece of medical testimony. *Galiotti v. Astrue*, 266 F. App'x 66, 67 (2d Cir. 2008) (quoting *Fiorello v. Heckler,* 725 F. 2d 174, 176 (2d Cir. 1983)). The ALJ "has the discretion to evaluate the credibility of a claimant and . . . arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged." *Cerrato v. Commissioner of Social Sec.*, 386 Fed. App'x 283, 286 (3rd Cir. 2010) (internal quotation and citation omitted). Furthermore, "where a claimant's subjective testimony is rejected, the ALJ must do so explicitly and specifically." *Kleiman v. Barnhart,* No. 03-CV-6035, 2005 WL 820261, at *12 (S.D.N.Y. Apr. 8, 2005) (citing *Williams v. Bowen,* 859 F. 2d 255, 261 (2d Cir. 1988)).

ALJ Strauss did not adequately consider plaintiff's 2010 testimony and, therefore, failed to take into account the worsening of plaintiff's physical and mental condition since her accident and initial evaluations. ALJ Strauss rarely discussed plaintiff's 2010 testimony, except for background information (such as age and weight) and testimony that her mother drove her to the

hearing. (R. 98-99.) In particular, ALJ Strauss did not discuss any 2010 testimony regarding physical or mental impairments, instead, she relied on plaintiff's testimony at the first ALJ hearing in 2007 and complaints made to her doctors. (R. 98-112.) Such reliance failed to consider plaintiff's testimony that her condition had worsened since the first hearing. At the 2010 hearing, unlike at the 2007 hearing, plaintiff testified to an inability to hold anything in either of her hands, and that both hands were swollen with discoloration and patches, had spasms, and were weak. (R. 40.) Plaintiff also claimed that pain in both of her hands prevented her from fine manipulations such as picking up, turning items, zipping up, buttoning, or pushing buttons. (R. 11.)

In finding that plaintiff had no limitations in activities of daily living due to psychiatric problems, ALJ Strauss looked to plaintiff's statements from the 2006 functional report and noted her difficulties related mainly to physical not mental problems. In June 2006, Plaintiff had not yet seen a psychologist or psychiatrist, or reported any mental problems. (*See* R. 110, 218-28, 423.) The ALJ again looked to the 2006 functional report in finding there was no changed status in social function from when plaintiff was working: "[T]he claimant told Dr. Broska [in October 2009] that she had no friends, but that is no indication this is a changed status from when the claimant was working. . . . [In fact,] the claimant stated [in the functional report] that she spends time with others talking to a psychiatrist every three to four days and she attends church once per month." (R. 110.) There are several problems with this. First, the 2006 functional report did not mention a psychiatrist, but rather physical therapy. (R. 218-28.) Second, ALJ Strauss did not take into account that the statement was from 2006, which would be evidence that a complaint of "no friends" in 2009 was a "changed status." Lastly, the failure to properly assess evidence post-2007 is in contravention of the Appeals Council's remand order directing the ALJ to obtain

additional evidence concerning claimant's mental impairment(s) and further evaluate claimant's mental impairment. (R. 132.)

ALJ Strauss continued to rely on the 2006 functional report in her step four analysis of plaintiff's left hand pain: "The functional report indicates that the claimant uses her left hand to do things for which she formerly used her right hand. . . . It is worthy to note that the claimant always reports problems with her right hand and never with her left hand." (R. 111.) She also cites a 2006 Disability Report when stating that plaintiff does not complain of the left upper extremity in her disability report. (*Id.*) The 2006 functional report occurred before plaintiff's subsequent complaints of pain in her left hand and the ALJ omitted plaintiff's persistent complaints of left hand pain starting in July of 2006. Moreover, ALJ Strauss dismissed and inadequately discussed objective medical evidence corroborating a worsening in plaintiff's condition. The EMG indicating bilateral CTS was not properly considered and Dr. Cubangbang's comprehensive examinations of plaintiff's back, neck, and upper extremities were not adequately discussed. These omissions led ALJ Strauss to give insufficient weight to the evaluations of treating physician Dr. Roger, whose records and assessments show the plaintiff began to complain about significant pain to her left hand in August 3, 2007, and consistently complained of pain in both hands up through January 2010, the last time she saw Dr. Roger. (R. 438.)

Lastly, ALJ Strauss did not discuss plaintiff's 2010 testimony when assessing plaintiff's credibility, even though there are inconsistencies. For example, plaintiff testified in 2010 that her left hand problems started in 2006, but medical records only corroborate complaints to the left hand beginning in July and August of 2007. (R. 14.) Further, plaintiff testified in July 2007 that she had been prescribed a cane, but could not support her bodyweight and did not use it,

however, at the 2010 ALJ hearing, plaintiff arrived using a cane, amidst complaints of a worsening condition, and testified it was prescribed in November 11, 2007 for back spasms. (R. 42-43, 480.) It is possible plaintiff's pain worsened such that she had no choice but to use the cane – the ALJ should have explored this.

### 2. ALJ Strauss Employed an Improper "Pick and Choose" Approach

"It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports [her] determination, without affording consideration to evidence supporting the plaintiff's claims." *Stewart v. Astrue*, No. 10-CV-3032 DLI, 2012 WL 314867 (E.D.N.Y. Feb. 1, 2012) (quoting *Sutherland v. Barnhart,* 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004)). A "pick and choose" approach undermines confidence in the ALJ's determination. *See Shaw v. Chater,* 221 F. 3d 126, 135 (2d Cir. 2000); *Watson v. Callahan,* 97 Civ 1398, 1997 WL 746455, at *13 (S.D.N.Y. Dec. 2, 1997) ("To allow the ALJ to rely on one portion of a doctor's report in support of his finding of no disability but then discount another portion of the very same report . . . would be inconsistent."). ALJ Strauss improperly focused on the right hand injury and underrepresented medical findings as to the back, neck, and left upper extremity, employing the "pick and choose" approach condemned by the Second Circuit. (R. 105); *Fiorello,* 725 F. 2d at 176. The court "cannot accept an unreasoned rejection of all the medical evidence in a claimant's favor." *Fiorello,* 725 F. 2d at 176.

First, ALJ Strauss disregarded the results of an EMG revealing bilateral CTS, though she mentioned it twice in her decision, and concluded plaintiff was not "being treated for" CTS. (*See* R. 96, 98-99, 102.) When plaintiff's attorney mentioned the EMG at the 2010 hearing, ALJ Strauss replied, "But that was – you can['t] have a problem with the bilateral – with the radiculopathy to – from the neck unless you have first some problem that's diagnostically shown with the neck, which is usually an MRI that shows there is some involvement." (R. 21.) If she

felt strongly that a neck MRI was necessary, she could have ordered one to be performed, but did not do so. Similarly, ALJ Strauss excluded portions of Dr. Roger's and Dr. Mathew's medical assessments for areas other than the right hand, because plaintiff was not being "formally treated" for these areas. (R. 101, 105.)

Second, ALJ Strauss claimed that "no . . . functional capacity assessment was made" by Dr. Cubangbang. Dr. Cubangbang made numerous positive findings upon physical examination of the back, neck, hip and bilateral upper extremities. (R. 373-76.) For the bilateral shoulder, Dr. Cubangbang stated that "muscle strength testing was decreased but limited by pain." (R. 375.) Dr. Cubangbang observed increased spasms, limited ROMs, and tenderness to plaintiff's back, neck, and bilateral shoulders, as well as positive indications for Tinel's, Phalen's, Compression, and Finkelstein tests regarding plaintiff's wrists and hands. (R. 374-75.) ALJ Strauss failed to mention or give credit to these findings.

Third, ALJ Strauss similarly employed the "pick and choose" approach in her selective reliance on consultative physicians Dr. Calvino and Dr. Mathew. ALJ Strauss dismissed any indication or medical opinion unrelated to the right upper extremity, beyond Dr. Calvino's 2006 assessment and a November 2007 lumbar spine x-ray that was normal. (*See* 102, 105.) ALJ Strauss relied heavily on Dr. Calvino's opinion that plaintiff had no restrictions in the left upper extremity or any restrictions for sitting, standing, and walking, instead of the more recent and/or extensive assessments made by Dr. Cubangbang in October of 2007, Dr. Mathew in 2009, or Dr. Roger from 2007-2010. (R. 105.) Dr. Calvino's exam of July 18, 2006 is less relevant to plaintiff's ailment of the back, neck and left upper extremity, because plaintiff did not start developing ailments in these areas until late 2006. Further, ALJ Strauss gave no weight to Dr. Mathew's findings of limitations to the back, neck, or the left shoulder, because there were no

objective medical findings or testing done to these areas, and, therefore, relied only on Dr. Mathew's assessments regarding the right upper extremity. (R. 104-05.) Overall, the ALJ's selective weighing of these doctors was complicated and misrepresented the extent to which the record as a whole indicated limitations in the left upper extremities, back, and neck. ALJ Strauss failed to explain why she gave significant weight to Dr. Mathew's opinion on the right upper extremity but not the left, especially since the EMG and the assessments of Dr. Cubangbang and Dr. Roger – all occurring a year after Dr. Calvino's assessment – supported Dr. Mathew's claim that limitations existed beyond the right hand.

The EMG and Dr. Cubangbang's findings concerning plaintiff's left upper extremity, back, and neck were not adequately considered, and ALJ Strauss credited Dr. Mathew only when his assessment coincided with her own finding on points unfavorable to the plaintiff. This improper "pick and choose" approach warrants remand.

3.    *ALJ Strauss Improperly Applied the Treating Physician Rule and Failed to Follow Her Duty to Develop the Record*

Plaintiff contends that the ALJ erred by not according the opinion of Plaintiff's treating physician the appropriate controlling weight. (*See* Pl. Mem. 24.) A treating source's medical opinion regarding the nature and severity of an impairment is given controlling weight when it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Schisler v. Sullivan*, 3 F. 3d. 563, 567 (2d Cir. 1993) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)(2)). The ALJ must consider the following factors to determine how much weight to give the treating physician's opinion: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant but

unspecified factors. *Id.* The ALJ is required to provide "good reasons" for the weight accorded to a treating physician's medical opinion; failure to do so is a ground for remand. *Schaal*, 134 F. 3d at 503-05; *Snell v. Apfel*, 177 F. 3d 128, 133 (2d Cir. 1999) ("Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand.") However, the ultimate determination that a claimant is "disabled" or "unable to work" is reserved to the Commissioner. 20 C.F.R. § 404.1527(d). "That means that the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative." *Snell*, 177 F. 3d at 133.

First, while ALJ Strauss noted that Dr. Roger has been treating plaintiff since September 12, 2006, she rejected Dr. Roger's opinion that plaintiff was "totally disabled," because she determined his medical records did not support his finding. (R. 101.) The ALJ gave significant weight to the opinion of Dr. Roger only with respect to the right upper extremity. (R. 100-02.) ALJ Strauss found that Dr. Roger's clinical notes did not show functional limitation in the claimant's left hand or left upper extremity. The ALJ further concluded that Dr. Roger's indication in the 2010 questionnaire that plaintiff is limited in performing activities with both hands was not supported by his own record or the examinations of Dr. Calvino in July 2006 or Dr. Mathew in July 2009, and was inconsistent with a prior report from July 2007.

Second, Dr. Roger observed problems with both hands on November 6, 2007, noting decreased flexion and pinch strength bilaterally. (R. 439.) On that day, he conducted Carpal Tinel's and Phalen's tests for both hands and indicated that plaintiff tested positive. (*Id.*) Furthermore, Dr. Roger's detection of tremors and diffuse paresthesias in both upper extremities and neck on December 18, 2007 indicates that his assessment is based on observation, not simply

acceptance of plaintiff's reported complaints. (R. 424-25, 440.) Further, Dr. Roger noted that the EMG was "reportedly positive for involvement of the cervical spine" and subsequently advised plaintiff to continue pain management, seek a specialist for the spine, and "wear splints at all times." (*Id*.)

Third, while "[t]he treating physician's medical opinion need not be supported by objective clinical or laboratory findings," an ALJ need not accept the physician's opinion if it is not supported by such findings and contradicted by substantial contrary evidence. *Cruz v. Sullivan*, 912 F. 2d 8, 12-13 (2d Cir. 1990). However, despite ALJ Strauss' identification of, what she determined were, three inconsistencies, such is not the case here. ALJ Strauss noted an inconsistency between Dr. Roger's 2010 questionnaire and his 2007 Physician's Report. ALJ Strauss noted that Dr. Roger "does not give a reason why claimant is now [in 2010] limited to occasionally lifting and carrying less than 1 pound, when he previously [in 2007] limited those activities to 5 pounds." (R. 101.) However, this inconsistency may be reconciled by the fact that the two assessments were three years apart and plaintiff's condition changed during that time, as observed by Dr. Roger. In fact, Dr. Roger's treatment notes from August 3, 2007 to May 14, 2008 corroborate the condition worsening since 2007.

ALJ Strauss cited a second inconsistency between Dr. Roger's questionnaire, which gave functional limitations in plaintiff's left hand or left upper extremity, and his clinical notes, which she stated did not show these functional limitations. Dr. Roger's records do reveal clinical findings regarding plaintiff's left hand beginning in August of 2007. (*See* R. 424-25.) Dr. Roger was not, as ALJ Strauss concluded, only treating plaintiff's right hand. (R. 101.) Plaintiff never maintained that Dr. Roger only treated her right hand, and the record suggests otherwise. (R. 14.) Treatment notes from five visits from August 3, 2007 to May 14, 2008 indicate that plaintiff

often complained to Dr. Roger of pain to both upper extremities, including paresthesias, tremors, sweating, mild edema, and tenderness in *both* hands. (R. 424-25, 438-42.) On December 18, 2007, Dr. Roger detected tremors in both hands, diffuse paresthesias of both upper extremities and neck, and noted that an EMG was "reportedly positive for involvement of the cervical spine." (R. 424-25, 440.) Dr. Roger made clinical observations of the left upper extremity and spine, and even directed plaintiff to wear splints on both hands and seek a spine specialist. (*Id.*)

ALJ Strauss cited a third inconsistency between Dr. Roger's questionnaire indicating functional limitations in both hands, and the examination findings and opinions of Dr. Calvino in July 2006 and Dr. Mathew in July 2009. As to Dr. Calvino, his 2006 assessment occurred before the medical evidence began to reveal a worsening of plaintiff's condition and bilateral involvement, and, again, any "inconsistency" may be attributed to the substantiated worsening of plaintiff's condition. As to Dr. Mathew, his assessment was consultative and brief, as plaintiff testified at the 2010 hearing. When "evaluating a claimant's disability, a consulting physician's opinions or report should be given limited weight. . . . because 'consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.'" *Cruz*, 912 F. 2d at 13 (quoting *Torres v. Bowen*, 700 F. Supp. 1306, 1312 (S.D.N.Y. 1988)). Further, ALJ Strauss's reliance on Dr. Mathew to contradict a treating physician's opinion of plaintiff's left arm is problematic because she explicitly disregarded Dr. Mathew's opinion as to plaintiff's left upper extremity.

Notably, ALJ Strauss did not seek further information from Dr. Roger to clarify any of these perceived inconsistencies. When "an ALJ perceives inconsistencies in a treating physician's report, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly," failure to do so may

constitute a breach of the ALJ's duty and provide a basis for remand. *Lazo-Espinoza v. Astrue*, No. 10-CV-2089, 2012 WL 1031417, at *13 (E.D.N.Y. March 27, 2012) (internal quotation marks omitted) (citing *Pearson v. Astrue*, No. 10–CV–00521, 2012 WL 527675, at *7 (N.D.N.Y. Feb. 17, 2012); *see also* 20 C.F.R. § 404.1512(e)(1) (requiring the ALJ to contact the treating physicians to seek "additional evidence or clarification" regarding any conflict, ambiguity, or lack of clinical or diagnostic support); *Cruz*, 912 F. 2d at 12 (a consulting opinion was given greater weight over a treating source only *after* efforts to re-contact the treating physician for clarification failed); *Seltzer v. Comm'r of Soc. Sec.*, No. 07-CV-0235, 2007 WL 4561120 (E.D.N.Y. Dec. 18, 2007) (failure to gather full records of treating physician is "especially problematic" since a treating physician's opinion must be given special evidentiary weight). This duty exists regardless of whether claimant is represented by counsel. *Perez v. Chater*, 77 F. 3d 41, 47 (2d Cir. 1996). ALJ Strauss had the duty and opportunity to seek out Dr. Roger to explain his findings, but failed to do so. Lastly, the fact that Dr. Roger is a hand specialist entitles his assessment of plaintiff's left hand to greater weight.

ALJ Strauss's scant discussions of the plaintiff's 2010 testimony, the EMG, and Dr. Cubangbang's findings, as well as her selective consideration of Dr. Mathew, together aggravated the error of giving no weight to Dr. Roger. The ALJ's reliance on ill-perceived inconsistencies and gaps to supplant Dr. Roger's assessment in favor of consulting physicians and her failure to contact Dr. Roger constituted a breach of her duty to develop the record. Together, these provide a basis for remand.

## B.    ALJ Strauss's Analysis of Plaintiff's Mental Impairments

Additional regulations govern evaluations of the severity of mental impairments. *Kohler v. Astrue*, 546 F. 3d 260, 265 (2d Cir. 2008) (citing 20 C.F.R. § 404.1520a). These regulations

require a "special technique" at steps two and three. *Id.* The reviewing authority determines whether the claimant has a "medically determinable mental impairment." *Id.* at 265-66 (quoting 20 C.F.R. § 404.1520a(b)(1)). If one is found, the authority then rates the degree of functional limitation resulting from the impairment along four broad categories: (1) activities of daily living ("ADLs"); (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. *Id.* at 266 (citing 20 C.F.R. §§ 404.1520a(b)(2), 404.1520a(c)(3)). The mental impairment is generally considered not severe, if the limitation in each of the first three areas is mild or better, with no episodes of decompensation. *Id.* (citing 20 C.F.R. § 404.1520a(d)(1)).

At the first step, ALJ Strauss found that plaintiff had not engaged in substantial gainful activity since her workplace accident on October 21, 2005. (R. 96.) Under steps two or three ALJ Strauss found no severe mental impairment. (R. 97.) At step four she considered plaintiff's RFC in light of the alleged mental impairment. (R. 105-11.) ALJ Strauss rated each functional limitation as "mild" or "no limitation" in accordance with the consultative examination of Dr. Broska, and noted that even though "Dr. Broska opined [that] claimant 'may not always appropriately deal with stress,' the doctor also stated that plaintiff's psychiatric problems are not significant enough to interfere with the claimant's ability to function on a daily basis." (R. 109-11.) Since the record indicated no repeated episodes of decompensation, ALJ Strauss concluded that the plaintiff did not have a severe mental impairment. (*Id.*)

The Appeals Council's ("AC") remand order directed the ALJ to evaluate the mental impairment in accordance with the special technique described in 20 C.F.R. §§ 1520a and 416.920a and to obtain additional evidence concerning claimant's mental impairment(s). (R. 132.) ALJ Strauss failed to follow the AC's remand directives, applied erroneous rationale in her weighing of the psychiatric evidence, and violated the treating physician's rule. ALJ Strauss

relied exclusively on the consulting opinion of Dr. Broska and provided flawed explanations for preferring this consultative opinion over those from plaintiff's treating sources, and, therefore, the ALJ's determination violated the treating physician rule and plaintiff is entitled to remand.

1.    *ALJ Strauss Improperly Weighed the Opinion and Evidence of Treating Psychologist Dr. Granda-Gilbert*

"The lack of specific clinical findings in the treating physician's report d[oes] not, standing by itself, justify the ALJ's failure to credit the physician's opinion." *Clark*, 143 F. 3d at 118 (citing *Schaal*, 134 F. 3d at 505). ALJ Strauss gave no weight to treating psychologist Dr. Granda-Gilbert's opinion – particularly, her 2007 assessment that rated plaintiff's functional limitations at "poor or none" – because the ALJ found her explanations were inadequate and unsupported by her treatment notes. (R. 105-06, 109.) The doctor "did not administer any tests to reach [her] conclusions and did not even administer a mental status examination." (*Id.*) ALJ Strauss also added that Dr. Granda-Gilbert's writing was illegible and spare, and that her relationship with plaintiff lasted only 6 months. (*Id.*) The court finds significant errors and omissions in the ALJ's interpretation of the record and the court remands this case so that proper weight can be given to Dr. Granda-Gilbert.

First, plaintiff saw Dr. Granda-Gilbert twenty-five times over a six-month period. (*See.* R. 449-56.) Although ALJ Strauss implied that this duration was too short, she failed to take into account the frequency of the visits and the nature of the relationship. *See Schisler v. Bowen*, 851 F. 2d 43, 46 (2d. Cir. 1988) ("The nature of the physician's relationship with the patient, rather than its duration or its coincidence with a claim for benefits, is determinative."); *cf. Mendez*, 2007 WL 186800, at *11-12 (the court found ALJ giving no weight to the treating physician appropriate where plaintiff had seen doctor only a few times over two months)); *Mendez*, 2007 WL 186800, at *11 n.7 ("the value of treating sources' opinions derives from their ability 'to

provide a detailed, longitudinal picture of [the claimant's] medical impairment(s).'" (quoting 20 C.F.R. § 404.1527(d)(2)).   The ongoing nature of the relationship provided enough of a "longitudinal picture" for Dr. Granda-Gilbert to give an informed assessment of plaintiff's mental impairment, especially when contrasted with the ALJ's reliance on plaintiff's single visit to Dr. Broska, to inform her determination as to mental impairment.

Second, ALJ Strauss' dismissal of Dr. Granda-Gilbert's July 2007 assessment is undercut by selective omissions and erroneous interpretations of the record.   First, ALJ Strauss incorrectly interpreted Dr. Granda-Gilbert's notes, in such a way that she omitted important findings.   ALJ Strauss quoted some of Dr. Granda-Gilbert's notes in her opinion.   For example, she quoted a note as follows: "'Pt's depression/anxiety totally diminishes her capacity to concentrate and *attend &/for interest with (balance illegible)*' and 'depression cripples the pt. emotionally and psychologically and this is *(illegible)* in this case.'"   (R. 105) (emphasis added).   The note actually reads, ". . . diminishes her capacity to concentrate and *attend and/or interact with staff or the public effectively*" and "depression cripples the patient emotionally and psychologically & this is *particularly true* in this case."   (R. 353-54) (emphasis added).   Elsewhere, ALJ Strauss quoted Dr. Granda-Gilbert's notes regarding plaintiff's initial presentment as "*mildly* depressed," (R. 106) (emphasis added), when in fact it reads, "*visibly* depressed."   (R. 456) (emphasis added).   On another occasion, ALJ Strauss simply omitted the explanation that: "Some of the major characteristics of depression are the disturbances of intellectual functions; the ability to concentrate and attend get disintegrated completely because the anxiety level is so high, that comprehension, memory, and thought organization do not have a chance to occur systematically."   (R. 354.)   Further, ALJ Strauss omitted the February 12, 2007 note, which stated that plaintiff "has become extremely depressed, anxious & 'wishes' she 'were dead.'"   (R.

456.)  This note supports Dr. Granda-Gilbert's comment on the Workers' Compensation form that plaintiff reported "some suicidal ideation," (R. 414-421), and undermines ALJ Strauss's assertion elsewhere that "the only report of . . . suicidal ideation claimant made w[as] to the consultant, Dr. Broska."  (R. 109.)  In addition, ALJ Strauss failed to mention the March 12 and May 7, 2007 notes where Dr. Granda-Gilbert observed plaintiff as "still scattered in her speech and her thoughts – all due to anxiety" and "scattered again today – difficult to have her focus & this is disheartening because she will require all her power of initiative to help herself deal."  (R. 454-55.)  Observations about a patient's speech, as well as observations of a tearful and anxious presentment, are components of a mental status examination.[1]  Omitting these notes calls into question the ALJ's determination that the doctor "did not even administer a mental status examination," as well as the ALJ's other reasons for discrediting Dr. Granda-Gilbert's assessments.

The ALJ's errors and omissions misrepresented Dr. Granda-Gilbert's explanations of her ratings and demonstrated a general tendency to either completely disregard or downplay the doctor's assessment of the severity of the mental impairment.  ALJ Strauss did mention such isolated notes as, "All quiet on the waterfront," "in better spirit today" and "better focused today."  (R. 106.)  While such notes may be relevant, they should be put into the larger context of less positive notes, especially given the doctor's observation that, "there is the slightest improvement in pt's demeanor *but I don't know if it is to please her psychologist as if it is from within—genuine that is*!"  (R. 452) (emphasis added.)  Notably, ALJ Strauss cited to the first half

---

[1] "The mental status examination is performed in the course of a clinical interview and is often partly assessed while the history is being obtained.  A comprehensive mental status examination generally includes a narrative description of your appearance, behavior, and speech; thought process (e.g., loosening of associations); thought content (e.g., delusions); perceptual abnormalities (e.g., hallucinations); mood and affect (e.g., depression, mania); sensorium and cognition (e.g., orientation, recall, memory, concentration, fund of information, and intelligence); and judgment and insight."  20 C.F.R. pt. 404, subpt. P., app. 1, § 12.00(D)(4).

of the observation, "there is the slightest improvement in pt's demeanor . . . (illegible)," but found the second half to be illegible. (R. 106.)

When analyzing the February 2007 narrative report, which diagnosed plaintiff with adjustment disorder and with mixed emotional features, ALJ Strauss again omitted statements that offer a basis for Dr. Granda-Gilbert's assessments. (R. 106.) The ALJ omitted the observation that "speech was scattered due to the anxiety level she experiences," the doctor's "guarded" prognosis, and the GAF rating of 52. Omitting the GAF rating is particularly significant since the Second Circuit has noted, "GAF rates overall psychological functioning on a scale of 0-100 that takes into account psychological, social, and occupational functioning." *Zabala v. Astrue*, 595 F. 3d 402, 405 n.1 (2d. Cir. 2010) (quoting American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV")*, at 34 (4th ed. rev. 2000)). "A GAF in the range of 51 to 60 indicates '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'" *Id.* at 406 n.3 (quoting *DSM-IV*, at 34) (emphasis in the original). Just below this range, "[a] GAF in the range of 41 to 50 indicates '[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'" *Id.* at 406 n.2 (quoting *DSM-IV*, at 34) (emphasis in the original). Here, plaintiff's GAF not only implicates the performance of some mental status examination, but the score of 52 coincides with the doctor's observations of plaintiff's speech, mood, and functioning. The GAF score gains further credibility because Dr. Shpitalnik gives a similar score of 50. (R. 368.) It is significant that ALJ Strauss failed to mention Dr. Granda-Gilbert's GAF assessment, especially because Dr. Broska did not obatain a

GAF rating.

Lastly, for an ALJ to assert a conclusion about the treating physician's opinion without supplying supporting facts comes, "dangerously close to . . . substituting his own judgment for that of a physician." *Brown v. Apfel*, 174 F. 3d 59, 63 (2d Cir. 1999). ALJ Strauss committed reversible error when she discounted the treating source by presuming that she did not give a mental status examination or finding that records did not support her assessment, particularly when omitted aspects of Dr. Granda-Gilbert's record suggest otherwise. Such errors and selective omissions indicate an improper "pick and choose" approach (*see* Section IV.A.2, *supra*) and remand is justified in order for the ALJ to give proper weight to Dr. Granda-Gilbert.

>    2.    *ALJ Strauss Improperly Weighed the Opinion and Evidence of Treating Psychiatrist Dr. Shpitalnik*

ALJ Strauss gave no significant weight to treating psychiatrist Dr. Shpitalnik, because she found him generally unreliable. She noted that the December mental status examination appeared to have been copied from the September 3 report, except the doctor added that cognitive functioning was significant for short-term and attention/concentration deficit; the ALJ also remarked that there were inconsistencies between the December evaluation and the progress note from the same date. (R. 107, 109, 111.) The ALJ also determined that Dr. Shpitalnik did not recount any tests upon which his conclusions were based. (R. 111.) ALJ Strauss gave no weight to Dr. Shpitalnik's "total disability" opinion on plaintiff's WC forms, explaining that WC requirements differ from those of SSA and, regardless, the issue of disability is reserved for the Commissioner. (R. 107, 109.)

First, the December mental status examination was an "Update" of the earlier report, and, therefore, while it is a verbatim copy of the same section from the September 3 report, it is unsurprising that Dr. Shpitalnik would only note changes. Further, re-contacting Dr. Shpitalnik

may have clarified this, but the ALJ failed in her duty to do so. (*See* Section IV.A.3, *supra*.)

Second, the claimed inconsistencies are overstated and may be reconciled based on evidence in the record. ALJ Strauss found the reliability of the narratives and progress notes of Dr. Shiptalnik to be in doubt, because the December evaluation "differs from the progress note of the same date as the progress note does not indicate psychomotor behavior and affect is noted as 'constricted,' not 'labile;' mood is checked as 'sad, anxious and irritable,' not 'depressed' and 'tense;' and attention is noted as 'intact,' not as 'deficit.'" (R. 107.) ALJ Strauss did not mention that the progress note contained no spaces to signify "depressed" or "tense" under "Mood," or that the descriptions could be equated with what Dr. Shpitalnik did mark in his progress note, i.e., "depressed" with "sad," and "tense" with "anxious and irritable." November's progress note, which ALJ Strauss did not discuss, explicitly indicated, "Tense, apprehensive" above "psychomotor behavior." (R. 383.) ALJ Strauss also failed to mention the notations from the December progress note regarding, "slow" cognition, "impaired" short-term memory, "reduced" concentration, "fair" insight, and "fair" judgment. (R. 381.) These support, rather than contradict, the remarks in the December Evaluation that plaintiff's "cognitive functioning is significant for short-term and attention/concentration deficit." (R. 366.) These also signify a worsening of plaintiff's condition since September, when Dr. Shiptalnik had observed cognitive functioning only as, "evidence of short-term memory and attention concentration deficit. Insight and judgment are good." (R. 368.) Finally, the December Evaluation may have been a summary of medical status examinations done since September, which may explain how Dr. Shpitalnik drafted the evaluation and some of its alleged discrepancies. That "labile" was not marked for affect and nothing was marked for psychomotor is correct, though it is noteworthy that a space to indicate that psychomotor was "normal" was

also left unmarked.  At most, this constituted a gap in the record triggering the ALJ's duty to re-contact the treating source.  ALJ Strauss's failure to re-contact the treating source constituted a breach in her affirmative duty to develop the record and led to an improper weighing of Dr. Shpitalnik's assessments of the plaintiff, for which remand is warranted.

## CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied.  Accordingly, pursuant to the fourth and sixth sentences of 42 U.S.C. § 405(g), the Commissioner's decision is reversed and the instant action is remanded for additional proceedings consistent with this opinion.  Specifically, the ALJ is directed to: (1) give proper weight to plaintiff's 2010 testimony; (2) thoroughly assess medical evidence concerning plaintiff's left upper extremity, back, and neck, particularly the EMG and Dr. Cubangbang's findings; (3) consider fully the findings of Dr. Mathew; (4) give proper weight to and thoroughly assess the findings of plaintiff's treating physician Dr. Roger, treating psychologist Granda-Gilbert, and treating psychiatrist Dr. Shpitalnik; and (5) develop the record as necessary as to plaintiff's left upper extremity, back and neck, the assessments by plaintiff's treating physicians, and plaintiff's mental condition as it relates to her disability claim.

SO ORDERED.

Dated: Brooklyn, New York
        September 19, 2012

                                                    _____/s/_____
                                                    DORA L. IRIZARRY
                                                    United States District Judge